Russell COLEMAN, Petitioner–
Appellant,

v.

Arthur CALDERON, Warden,
Respondent–Appellee.

Russell Coleman, Petitioner–Appellee,

v.

Arthur Calderon, Warden, Respondent–
Appellant.

Nos. 97–99013, 97–99014.

United States Court of Appeals,
Ninth Circuit.

Reargued and Submitted Nov. 4, 1999

Filed May 2, 2000

Cliff Gardner and Robert Derham, Gardner & Derham, San Francisco, California, for the petitioner-appellant-cross-appellee.

Morris Beatus, Deputy Attorney General, San Francisco, California, for the respondent-appellee-cross-appellant.

Before: SCHROEDER, BRUNETTI, and THOMPSON, Circuit Judges.

Opinion by Judge DAVID R. THOMPSON; Partial Concurrence and Partial Dissent by Judge BRUNETTI.

DAVID R. THOMPSON, Circuit Judge:

We reconsider this appeal on remand from the Supreme Court, *Calderon v. Coleman*, 525 U.S. 141, 119 S.Ct. 500, —— L.Ed.2d —— (1998), to determine whether an erroneous jury instruction given by the trial court was harmless. *See Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). After reconsideration, we conclude, under *Brecht*, that the instruction had a substantial and injurious effect on the jury's verdict. Ac-

cordingly, we affirm the decision of the district court granting petitioner Russell Coleman's habeas petition as to his death sentence.

Coleman also asks us to reconsider whether he is entitled to habeas relief from his conviction. He contends that in our prior opinion we mistakenly relied on *Gray v. Netherland,* 518 U.S. 152, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996), to conclude that the government's alleged affirmative concealment of inculpatory evidence could not violate due process. Although we agree that we erred by relying on *Gray,* we affirm the decision of the district court denying relief from the conviction.

## FACTS

Because our prior opinion describes the facts of this case in detail, *see Coleman v. Calderon,* 150 F.3d 1105 (9th Cir.1998), *rev'd, Calderon v. Coleman,* 525 U.S. 141, 119 S.Ct. 500, —— L.Ed.2d —— (1998), our description here will be brief. Coleman is a California prisoner under sentence of death. In 1981, a jury convicted him of raping and murdering Shirley Hill. The jury also found two special circumstances, which made Coleman eligible for the death penalty under California law. *See People v. Coleman,* 46 Cal.3d 749, 761, 251 Cal. Rptr. 83, 759 P.2d 1260 (1988). Coleman was sentenced to death. His conviction and sentence were upheld by the California Supreme Court.

Coleman then filed a habeas petition in the district court, challenging the constitutionality of his conviction and sentence. The district court denied Coleman relief from his conviction but granted relief from his sentence. The court held that the state trial court erred when, during the penalty phase of Coleman's trial, the court instructed the jury on the Governor's power to commute a sentence of life imprisonment without the possibility of parole to a lesser sentence that would include the possibility of parole. The district court also determined that the instructional error was not harmless because, after considering the prosecution's argument, the aggravating and mitigating evidence and the record as a whole, it was reasonably likely the commutation instruction prevented the jury from giving full effect to Coleman's mitigation evidence. We affirmed. *See Coleman,* 150 F.3d at 1105. Both Coleman and the respondent State of California filed petitions for writs of certiorari. The Supreme Court granted the State's petition, denied Coleman's petition, and reversed and remanded the case to this court for reconsideration. *See Calderon,* 525 U.S. at 147, 119 S.Ct. 500.

The Supreme Court determined that even if the state court's jury instruction was constitutionally deficient, we should have applied a harmless error analysis under *Brecht.* The Court explained that existing Ninth Circuit authority mistakenly conflated *Brecht*'s harmless error test with the test for constitutional error set forth in *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). The Court clarified that *Boyde* merely establishes "the test for determining, in the first instance, whether constitutional error occurred." *Calderon,* 525 U.S. at 146, 119 S.Ct. 500. If it did, then a reviewing court must go further and determine whether, using a *Brecht* analysis, the *Boyde* error had a substantial and injurious effect or influence on the jury's verdict. *Id.* at 147, 119 S.Ct. 500.[1]

We begin our analysis by considering whether the state trial court's jury instruction constituted a *Boyde* error. To determine whether a *Boyde* error occurred, we ask "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that

---

1. By clarifying that a *Boyde* error may be harmless, we note the Supreme Court implicitly overruled *McLain v. Calderon,* 134 F.3d 1383 (9th Cir.1998); *McDowell v. Calderon,* 130 F.3d 833 (9th Cir.1997), *cert. denied,* 523 U.S. 1103, 118 S.Ct. 1575, 140 L.Ed.2d 807 (1998); and *Hamilton v. Vasquez,* 17 F.3d 1149 (9th Cir.1994), to the extent they held that a *Boyde* error is per se harmful.

prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380, 110 S.Ct. 1190.

■ Because a death sentence is qualitatively different from other forms of punishment, there is a greater need for reliability in determining whether it is appropriate in a particular case. *See Fetterly v. Paskett*, 997 F.2d 1295, 1300–01 (9th Cir.1993) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304–05, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)). We have therefore held that the Eighth and Fourteenth Amendments require that "the sentencing body's attention be directed to the specific circumstances of the crime and the characteristics of the defendant." *See Hamilton v. Vasquez*, 17 F.3d 1149, 1160 (9th Cir.1994).

■ Here, the state trial court instructed the jury as follows:

> You are instructed that under the State Constitution, a Governor is empowered to grant a reprieve, pardon or commutation of a sentence following conviction of the crime.

> Under this power, a Governor may in the future commute or modify a sentence of life imprisonment without the possibility of parole to a lesser sentence that would include the possibility of parole.

> So that you will have no misunderstandings relating to a sentence of life without the possibility of parole, you have been informed generally as to the Governor's commutation modification power. You are now instructed, however, that the matter of a Governor's commutation power is not to be considered by you in determining the punishment for this defendant.

> You may not speculate as to if or when a governor would commute the sentence to a lesser one which includes the possibility of parole.

As we have previously explained, this instruction was misleading because it told the jury that the Governor had the power to commute Coleman's sentence but left out the additional hurdles to be overcome

to obtain such a commutation. When a person has two prior felony convictions, as Coleman did, he must apply directly to the Governor to have his sentence commuted. *See* Cal.Penal Code § 4802. The Governor must then confer with the Board of Prison Terms, and may commute the defendant's sentence only upon the written recommendation of four justices (a majority) of the California Supreme Court. *See* Cal. Const., Art. 5 § 8; Cal.Penal Code §§ 4802, 4813, 4852. The instruction given to Coleman's jury failed to include this additional information. It was, therefore, misleading. It suggested the Governor could, at his sole discretion, commute a sentence from life imprisonment without the possibility of parole to some lesser sentence that would include the possibility of parole.

Not only was the instruction misleading, it was constitutionally infirm because it discouraged the jury from giving due weight to Coleman's mitigating evidence. *See McLain v. Calderon*, 134 F.3d 1383, 1386 (9th Cir.1998); *Hamilton*, 17 F.3d at 1162–63; *cf. Boyde*, 494 U.S. at 380, 110 S.Ct. 1190; *but see People v. Hart*, 20 Cal.4th 546, 656, 85 Cal.Rptr.2d 132, 976 P.2d 683 (1999) (holding that although a similar instruction was incomplete it was not constitutionally deficient in view of the trial judge's other comments), *cert. denied*, —— U.S. ——, 120 S.Ct. 811, 145 L.Ed.2d 683 (2000). By explaining that the Governor was entitled to commute the sentence and by directing the jury *not* to speculate about that fact, the instruction "invited the jury to assume that the question of [Coleman's] release would automatically come before" the Governor. *Hamilton*, 17 F.3d at 1161. We have previously held that this inference is unconstitutional because it invites the jury to speculate that the only way it can avoid a defendant's release is to sentence him to death. *See id.* at 1162; *see also McLain*, 134 F.3d at 1386. In this way, the jury was diverted from its task by having its attention focused on the Governor's ill-defined commutation power rather than the mitigation

evidence introduced during the penalty phase. *See Hamilton*, 17 F.3d at 1162–63.

■ Having determined that the instruction was constitutionally infirm, we now consider whether the instruction was nonetheless harmless under *Brecht*. In this part of our analysis, we consider whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). If we are in grave doubt as to whether the error had such an effect, the petitioner is entitled to the writ. *See O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

We conclude the instruction did have a substantial and injurious effect or influence in determining the jury's verdict. We begin with the instruction itself. The instruction was not only unconstitutionally misleading, it undermined the very core of Coleman's plea for life. Although an accurate description of sentencing alternatives would have helped the jury focus on its task of evaluating whether the circumstances of this case and the characteristics of this defendant warranted a death sentence, the jury was invited to speculate that the only way it could be assured Coleman would not be released would be to sentence him to death.

The prosecutor's closing argument exacerbated the impact of the misleading instruction by emphasizing the threat Coleman posed to the general public. *Cf. Hamilton*, 17 F.3d at 1162. The prosecutor argued that not only would Coleman pose a continuing threat to prison personnel if he were sentenced to life in prison, he would remain a risk to "all of us" if a death sentence were not imposed. He explained Coleman was unable "to coexist in society as we know it" and implored the jury to impose death, not only to protect prison employees, but "for our benefit as well." These arguments referring to Coleman's danger to "all of us" reinforced the instruction's suggestion that if he were not

sentenced to death, he could be paroled into society by the singular whim of a Governor. This focused the jurors' fear on Coleman's possible release. *See* Theodore Eisenberg & Martin T. Wells, *Deadly Confusion: Juror Instructions in Capital Cases*, 79 Cornell L.Rev. 1, 4 (1993) ("Our data confirm that jurors' deliberations emphasize dangerousness and that misguided fears of early release generate death sentences.").

The State argues the prosecutor's argument did not focus the jurors on the risk of Coleman's release, nor were the jurors misled by the erroneous instruction. The State contends that Coleman's mitigation evidence was inconsequential, and the jurors could not have been confused because they returned a verdict of death in less than three hours. We find this argument unpersuasive. The short period of deliberation is more likely explained by the jurors' focus on the fear Coleman might be paroled if he were not sentenced to death, and their singular attention to that concern to the exclusion of the other factors they were instructed to consider. *See* Cal.Penal Code § 190.3. At the very least, we "cannot say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239. Accordingly, we affirm the district court's judgment granting Coleman's habeas petition as to his sentence of death.

■ We turn next to Coleman's contention that although the Supreme Court remanded the case to our court to consider whether the instructional error was harmless, we should take this opportunity to reconsider Coleman's challenge to his conviction and correct an error in our earlier opinion. Coleman asserts he is entitled to relief from his conviction because the prosecution affirmatively concealed the results of a Hemastix test and bloody print evidence it disclosed. According to Coleman, springing this inculpatory evidence on him

at the time of trial without prior notice violated his Due Process right to a fair trial because it denied him "a reasonable opportunity to know the claims of the opposing party and to meet them." *Morgan v. United States,* 304 U.S. 1, 18, 58 S.Ct. 773, 82 L.Ed. 1129 (1938); *see also Lindsey v. Smith,* 820 F.2d 1137, 1151 (11th Cir.1987); *United States v. Baum,* 482 F.2d 1325, 1331–32 (2d Cir.1973). In our previous opinion, we concluded this argument was foreclosed by *Gray v. Netherland,* 518 U.S. 152, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996). *See Coleman,* 150 F.3d at 1112. We were wrong about that. Coleman now correctly points out that *Gray* never held that due process is not violated when the government affirmatively conceals inculpatory evidence. The petitioner in *Gray* raised the issue, but the Supreme Court did not decide it. The Court instead remanded the case to determine whether the argument was procedurally barred. *See Gray,* 518 U.S. at 170–71, 116 S.Ct. 2074.

■■■■ Although Coleman correctly identifies our error, the State suggests Coleman is barred from raising the issue under the law of the case doctrine. We are inclined to agree.[2] "Law of the case is a jurisprudential doctrine under which an appellate court does not reconsider matters resolved on a prior appeal." *Jeffries v. Wood,* 114 F.3d 1484, 1488–89 (9th Cir. 1997). This doctrine is founded upon "the sound public policy that litigation must come to an end. An appellate court cannot efficiently perform its duty to provide expeditious justice to all if a question once considered and decided by it were to be litigated anew in the same case upon any

and every subsequent appeal." *Kimball v. Callahan,* 590 F.2d 768, 771 (9th Cir.1979) (citing *White v. Murtha,* 377 F.2d 428, 431 (5th Cir.1967)).

Coleman responds our prior opinion never became law of the case because our mandate never issued. *See United States v. Simmons,* 923 F.2d 934, 956 (2d Cir. 1991); *cf. United States v. Miller,* 822 F.2d 828, 833 (9th Cir.1987). Even if Coleman is correct, however, he is not entitled to relief from his conviction because he cannot show he was prejudiced by the State's conduct in a way that rendered his trial fundamentally unfair. *See Lindsey,* 820 F.2d at 1151 (" ... habeas relief is justified only upon a showing that the impairment to the defense affected the outcome of the trial."); *cf. United States v. Tamura,* 694 F.2d 591, 598–600 (9th Cir.1982); *United States v. Padrone,* 406 F.2d 560, 561 (2d Cir.1969) (concluding noncompliance with an order to furnish a copy of a statement made by the defendant warrants a new trial where there is prejudice).

Coleman has failed to show that he was prejudiced by the State's concealment of the Hemastix test and the bloody print evidence it disclosed. The presence of a "bloody print" had been noted on a chair back at the crime scene. Coleman's trial counsel, however, had not examined that chair. The presence of the bloody print was also disclosed in a police report of Coleman's questioning after his arrest, but Coleman's trial counsel believed that was simply hyperbole used by the police to try to get Coleman to confess. On the other hand, there was no notation of a bloody print on the police latent print card, and at

---

2. We add Coleman was not without a remedy when we issued our previous opinion. Federal Rule of Appellate Procedure 40(a) establishes the procedure through which a party may move the court to consider "the points of law or fact which in the opinion of the petitioner the court has overlooked or misapprehended." Coleman never filed a Rule 40(a) motion. Instead, he filed a petition for a writ of certiorari to the Supreme Court, which was denied. Because Coleman failed to either raise the *Gray* issue in a timely filed Rule

40(a) motion or justify his tardy presentation, he would be foreclosed from seeking relief on this basis now. *See Eubank Heights Apartments, Ltd. v. Lebow,* 669 F.2d 20, 23 (1st Cir.1982) ("Only upon a showing of injustice of major proportions—not mere arguable error—would we entertain reopening an issued opinion in these circumstances."); *United States v. Gargotto,* 510 F.2d 409, 412 (6th Cir.1974); 5 Am.Jur.2d (Appellate Review) § 879 (1995).

the preliminary hearing Inspector Ihle testified there were no bloody prints found at the crime scene.

Coleman's trial counsel knew, however, that Coleman's fingerprints had been found in the bungalow where Hill had been murdered, and that his print was on the chair back. What he did not know was that the Hemastix test had been conducted on the material on the chair back and the results of that test showed Coleman's print was a "bloody print." It was the results of the Hemastix test that surprised the defense, and the State had violated a discovery order in failing to turn over that evidence. The State does not contest its violation of the discovery order, nor does it contest that Coleman was affirmatively misled.

Notwithstanding these circumstances, however, the defense was able to counter the State's presentation of the Hemastix test and bloody print evidence. Inspector Ihle admitted that although the Hemastix test showed the presence of blood, it did not indicate whether the blood was human. He also stated he had only used the Hemastix test on a few substances to determine whether it generated false positive results. Finally, he testified he did not even know how the test worked. These points scored by the defense blunted the thrust of the Hemastix test and its results. Indeed, at the evidentiary hearing in the district court, Coleman's defense counsel testified that he was satisfied by his cross-examination that he had exposed Ihle's testimony as "absurd." He did not move for a continuance to combat the evidence further.

Other evidence also placed Coleman at the scene of the murder and pointed toward his guilt. Fingerprint evidence, bloody or not, demonstrated Coleman had been in the bungalow. The positioning of his prints in relation to Hill's body and Hill's own fingerprints also suggested Coleman was the perpetrator of the rape and murder. Serology evidence also placed Coleman at the scene of the crime at the time of the murder. Coleman's alibi

was completely eviscerated. Coleman claimed that he attended class on the day of the murder until 3:30 p.m., left school in the company of a friend, Carlton McAllister, and went home and spent the evening with his family. Class records offered by the prosecution, however, indicated Coleman did not attend class on that day but was excused. Coleman's alibi witnesses were also impeached. McAllister admitted that he could have met Coleman on a different day and Coleman's former wife conceded that she had not told anyone about the alibi earlier, even though it might have absolved Coleman, because she did not think it was "her place to volunteer information." Finally, Coleman lied about having been in the bungalow where Hill was murdered. Initially he denied ever being in the bungalow, and then when confronted with the fingerprint evidence, he changed his story.

In sum, the evidence of Coleman's guilt was ample with or without the Hemastix test and bloody print evidence. At trial, the defense effectively blunted the force of that evidence, and the government's previous concealment of it did not render Coleman's trial fundamentally unfair.

## CONCLUSION

We conclude the district court did not err in granting relief from the sentence. Not only was the erroneous instruction constitutionally infirm, the instruction had a substantial and injurious effect on the jury's verdict. We also affirm the district court's judgment denying Coleman relief from his conviction.

AFFIRMED.

BRUNETTI, Circuit Judge, concurring in part, dissenting in part:

I agree with the majority's conclusions that Coleman was not prejudiced by the concealment of the Hemastix and bloody print evidence and that the commutation instruction was constitutionally deficient under *Boyde v. California*, 494 U.S. 370,

380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990). I dissent, however, from the majority's determination that the commutation instruction had a "substantial and injurious effect" on the jury's deliberations and thus was not harmless. *See Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). I dissent because the majority's analysis does not follow the Supreme Court's pronouncements in *Brecht* and its progeny and because the record indicates that Coleman did not suffer any actual prejudice from the application of the Briggs instruction.

## I.

Almost two decades ago, the United States Supreme Court approved California's use of a Briggs instruction, an instruction that permits juries to consider the governor's power to commute a life sentence without the possibility of parole to a life sentence with the possibility of parole. *See California v. Ramos,* 463 U.S. 992, 1004 n. 19, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). The Supreme Court never reached the harmless error issue in *Ramos* because it found that a Briggs instruction is compatible with the Eighth and Fourteenth Amendments and thus does not suffer from any constitutional infirmity. *See id.* at 1014, 103 S.Ct. 3446. The Supreme Court expressly recognized in *Ramos* that even though a Briggs instruction allows a jury to focus on the danger a defendant poses to society, it nevertheless held that considering future dangerousness is legitimate and "'is simply one of the countless considerations weighed by the jury in seeking to judge the punishment appropriate to the individual defendant.'" *Id.* at 1008, 103 S.Ct. 3446 (quoting *Zant v. Stephens,* 462 U.S. 862, 900, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)). In upholding the instruction, the Supreme Court declared that "[c]onsideration of the commutation power does not undermine the jury's statutory responsibility to weigh aggravating factors against mitigating factors and impose death only if the former outweighs the latter." *Id.* at 1008 n. 22, 103 S.Ct. 3446.

Despite the Supreme Court's definitive pronouncement in *Ramos,* the majority opinion concludes not only that the Briggs instruction in this case violates the Constitution, but that the error prejudiced Coleman irrespective of the admonitory instruction specifically advising the jury to disregard the governor's commutation power. The majority's position rests solely upon the difference between the two-sentence instruction in *Ramos* and the challenged jury instruction in this case. The majority correctly recognizes that the Briggs instruction applied in this case omits "the additional hurdles to be overcome to obtain such a commutation" with a twice-convicted felon. The instruction is incomplete because the governor's commutation power is wholly dependent on meeting several other statutory requirements. Specifically, the governor must confer with the Board of Prison Terms and obtain the written approval of a majority of the California Supreme Court before commuting a sentence. *See* Cal. Const., Art. 5 § 8; Cal.Penal Code §§ 4802, 4813, 4852. While I agree that this omission rises to the level of constitutional error, the error was harmless under prevailing Supreme Court precedent.

## A.

Under the *Brecht* test, an error is harmless unless it has a "substantial and injurious effect on the jury's verdict." *See Brecht,* 507 U.S. at 637, 113 S.Ct. 1710. The Supreme Court advised us on remand that *Brecht* requires "the court [to] find that the defendant was actually prejudiced by the error" before overturning Coleman's sentence. *Calderon v. Coleman,* 525 U.S. 141, 119 S.Ct. 500, 503, —— L.Ed.2d —— (1998). In remanding the case, the Supreme Court discussed the differences between the *Boyde* test for constitutional error and *Brecht* harmless error analysis. The Court stated:

> Although the *Boyde* test for constitutional error, like the *Brecht* harmless-error test, furthers the "strong policy against retrials years after the first trial

where the claimed error amounts to no more than speculation," it is not a substitute for the *Brecht* harmless error test. The *Boyde* analysis does not inquire into the actual effect of the error on the jury's verdict; it merely asks whether constitutional error has occurred.

*Coleman,* 119 S.Ct. at 503 (citations omitted).

The instructional error in this case is harmless because there is no evidence that the instruction actually prejudiced Coleman. The Supreme Court has stated that a challenged jury instruction " 'may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' " *Boyde,* 494 U.S. at 378, 110 S.Ct. 1190. The only error was the incomplete information contained in the Briggs instruction. The trial court did not omit or misrepresent any of the mitigating and aggravating factors. In addition, the trial court correctly instructed the jury that it should weigh the mitigating and aggravating factors in reaching its sentencing decision. Furthermore, the Briggs instruction itself proclaimed to only "generally" inform the jurors about the governor's commutation power. Contrary to the majority's analysis, it did not purport to be a definitive and conclusive statement about that power.

The admonitory instruction provides further evidence that the instruction, taken as a whole, was harmless. The trial judge carefully instructed the jury that it "may not speculate as to if or when a governor would commute the sentence to a lesser one which includes the possibility of parole." The plain language of this instruction clearly reflects an effort by the trial judge to avoid any prejudice toward Coleman. The general rule is that jurors are presumed to follow admonitory instructions given by the court. *See Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). There is no reason to make an exception in this case.

The majority opinion's conclusion is tenuous because it gives effect to only part of the Briggs instruction. On the one hand, the majority opinion places such great weight on the incomplete Briggs instruction that it infers that the instruction infected sentencing by damaging the jury's ability to consider all the mitigating evidence. At the same time, it gives little or no effect to the admonitory instruction and implicitly assumes that the jury was incapable of following the court's command to ignore the commutation power in reaching its sentencing determination. Rather than assume that the jury embraced only part of the challenged instruction, the reasoned approach of the California Supreme Court presumed that the jury considered all parts of the Briggs instruction equally in sentencing Coleman.[1] *See People v. Coleman,* 46 Cal.3d 749, 782, 251 Cal.Rptr. 83, 759 P.2d 1260 (Cal.1988). Under such an analysis, and as the California Supreme Court held, the admonitory instruction eliminated any prejudice because it plainly advised the jury to ignore the governor's commutation power altogether in its sentencing decision.[2]

---

1. We are bound by case law in this Circuit holding that this Briggs instruction is constitutionally infirm because it tends to divert the jury's attention away from mitigating evidence. *See McLain v. Calderon,* 134 F.3d 1383, 1386 (9th Cir.1998); *Hamilton v. Vasquez,* 17 F.3d 1149, 1160 (9th Cir.1994). However, because the connection is speculative, this rationale is unpersuasive under the *Brecht* analysis because an abstract link to the jury verdict does not show actual prejudice under *Brecht. See Coleman,* 119 S.Ct. at 503.

2. This conclusion is especially germane because as Judge Trott pointed out in dissent in

*Hamilton v. Vasquez,* 17 F.3d 1149, 1170 (9th Cir.1994), the jurors were probably instructed to ignore a factor they already knew about. *See also Ramos,* 463 U.S. at 1003 n. 18, 103 S.Ct. 3446 (arguing that the State of California may have established the Briggs instruction "to avoid any possible misconception conveyed by the description of the sentencing alternative."). "The commutation power was the subject of great public debate in California during the late 1970s, a debate that culminated in a 1978 voter death penalty initiative properly known as the Briggs Initiative." *Hamilton,* 17 F.3d at 1170. Therefore, rather than inviting the jury to speculate about com-

The harmlessness of the error is supported by recent Supreme Court and out-of-circuit case law. For instance, in *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), a case decided during the same Term as *Coleman*, the Supreme Court held that omitting an element of a crime in a jury instruction is harmless if the reviewing court can conclude that the evidence proves the omitted element beyond a reasonable doubt. *See id.* at 1838–39. This result is compelling because the Supreme Court found the instructional error harmless even though it was subject to the more onerous *Chapman* harmless error standard applied on direct review. *See California v. Roy*, 519 U.S. 2, 5, 117 S.Ct. 337, 136 L.Ed.2d 266 (1996). Harmless error review under *Chapman* requires a reviewing court to overturn a verdict or sentence unless an error is "harmless beyond a reasonable doubt." *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). By holding that even an instruction omitting an element is harmless under *Chapman*, the Supreme Court expressed its view that harmless error analysis is more than a mere formality and that a reviewing court should engage in a probing inquiry in order to determine whether an error results in actual prejudice.

Furthermore, in two recent cases, the Fifth and Eleventh Circuits found that misstating the mitigating or aggravating factors in a jury instruction was harmless. *See Sims v. Singletary*, 155 F.3d 1297, 1315 (11th Cir.1998) (holding that a trial court's vague reference to non-statutory mitigating factors was harmless even if it did constitute error); *Billiot v. Puckett*, 135 F.3d 311, 315 (5th Cir.1998) (declaring that even an unconstitutionally vague instruction on an aggravating factor is harmless). In *Sims* for example, the trial court made only a vague reference to non-statutory mitigating factors by instructing the jury that it could consider the statutory factors "among others" without providing

mutation as the majority suggests, the trial judge was instead attempting to instruct the

any further elaboration. *See Sims*, 155 F.3d at 1315. Despite this error, the court held that the defendant's "sentencer was not precluded from considering all relevant mitigating evidence" even though the instruction failed to provide any guidance about what non-statutory factors the jury could consider during the sentencing phase. *Id.*

Based on *Neder, Sims,* and *Billiot*, the challenged jury instruction in this case should not have failed the *Brecht* harmless error test. If the erroneous instruction in *Sims* was deemed harmless despite the incomplete information it provided about the mitigating factors, it is certainly a stretch to infer that a jury's ability to consider mitigating evidence was inhibited by an erroneous Briggs instruction omitting only the technical details about the governor's commutation power. Rather, the majority opinion's conclusion that the instructional error prejudiced Coleman is premised on pure speculation, a basis that is inappropriate under *Brecht*. *See Coleman*, 119 S.Ct. at 503 (declaring that an error cannot fail the *Brecht* test based on pure speculation).

### B.

The majority's other ground for finding that the instructional error was prejudicial is similarly unpersuasive. The majority opinion concludes that the *actual use* of a Briggs instruction in this case was prejudicial because the prosecutor repeatedly emphasized the threat Coleman posed to the general public. To support that proposition, the majority refers to several isolated statements made by the prosecutor during closing arguments. Because the Supreme Court has held that it is proper for the jury to consider a defendant's future dangerousness and because the record shows that Coleman did not suffer actual prejudice, I respectfully disagree.

jury *not* to speculate about the governor's commonly known commutation power.

In *Ramos,* the Supreme Court unqualifiedly held that it is permissible for the jury to consider both a defendant's future dangerousness and the governor's commutation power in its sentencing determination. *See Ramos,* 463 U.S. at 1008 n. 22, 103 S.Ct. 3446. *Ramos* also declared that a Briggs instruction is proper even though it "focuses the jury's attention on whether this particular defendant is one whose possible return to society is desirable." *Id.* at 1005, 103 S.Ct. 3446. The challenged jury instruction in this case is not prejudicial merely because it "emphasiz[ed] the threat Coleman posed to the general public" and "focused the jurors' fear on Coleman's possible release" because *Ramos* clearly held that a jury may consider these factors in sentencing a defendant.

The record also suggests that Coleman was not prejudiced by the Briggs instruction. While the prosecutor stressed the danger Coleman posed to society during his closing arguments, he never mentioned the governor's commutation power. In addition, the prosecutor repeatedly told the jurors that they must decide Coleman's sentence based solely on the law and that the law required them to carefully balance the aggravating and mitigating factors. Finally, the prosecutor's statements were focused on attacking Coleman's mitigating factors and arguing that the weight of the evidence supported a death sentence, not on introducing improper factors into the jury's analysis.

## II.

The California Supreme Court opinion demonstrates that there was plenty of evidence in the record to support Coleman's death sentence. *See People v. Coleman,* 46 Cal.3d 749, 761, 251 Cal.Rptr. 83, 759 P.2d 1260 (Cal.1988). This is not a case where the jury's imposition of the death penalty was based upon questionable grounds. Rather, the aggravating factors clearly established that Coleman was a danger to society based upon his conduct both inside and outside of prison.

Russell Coleman was convicted of brutally murdering Shirley Hill while attempting to rape and sodomize her. *See id.* at 756, 251 Cal.Rptr. 83, 759 P.2d 1260. The jury also determined that Coleman used a deadly weapon in the course of committing this heinous crime. *See id.* Other aggravating factors included Coleman's earlier convictions for falsely imprisoning a college student, carrying a concealed weapon, raping a thirteen-year-old girl, and engaging in lewd conduct involving a thirteen-year-old child. *See id.* at 761, 251 Cal. Rptr. 83, 759 P.2d 1260. Coleman was convicted of each of these crimes prior to his murder trial. *See id.* In addition, the prosecution presented evidence that prison officials had recovered a stabbing weapon in Coleman's prison cell and that he was responsible for a series of assaults in prison. *See id.* Coleman assaulted inmates, guards, and medical personnel while he was incarcerated. *See id.* Finally, the prosecution presented testimony that Coleman had to be transferred to San Quentin because his behavior posed a threat to prison staff and other inmates. *See id.*

In sum, the evidence that the jury considered in sentencing Coleman was more than adequate to justify his death sentence.

## III.

Based on the Supreme Court's pronouncements in *Ramos* as well as a review of the record in this case, there is nothing that indicates Coleman was actually prejudiced by the use of the Briggs instruction.[3] Therefore, I respectfully dissent from the majority's conclusion that the Briggs in-

---

3. It is improper to speculate about whether the jury's short deliberative period is indicative of the jury's belief that Coleman deserved the death penalty or rather that jurors were focused on the possibility that Coleman might be paroled if he didn't receive a death sentence. A consideration of the length of the jury's deliberations invites speculation into the *Brecht* analysis, precisely what the Supreme Court advised us to avoid on remand. *See Coleman,* 119 S.Ct. at 503.

struction in this case was not harmless. Rather, I would sustain the sentence imposed by the jury of Coleman's peers.