[No. S064415. July 16, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL LAMAR BRAMIT, Defendant and Appellant.

**Counsel**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Peter R. Silten, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Gil P. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CORRIGAN, J.**—Defendant Michael Lamar Bramit was sentenced to death after a jury convicted him of first degree murder and found that he personally used a firearm in the commission of the crime. The jury also found true the special circumstance that the murder occurred in the course of a robbery.[1] This appeal is automatic. We affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Guilt Phase*

Defendant does not contest the facts pointing to his guilt, nor did he do so below.[2] Several witnesses saw him murder Jose Fierros. Their testimony was corroborated by his extrajudicial statements, the admissibility of which he did not challenge. Therefore, the facts establishing defendant's guilt are stated briefly.

Around midnight on June 14, 1994, victim Fierros parked at a minimart in Banning, where two prostitutes separately propositioned him. However, after Fierros drove each of them away from the parking lot, he said he had no money and returned to the minimart with them.

Another prostitute, Rebecca Johnson, then got into Fierros's car. As they drove away, defendant and Anthony Miller, both of whom Johnson knew from previous drug transactions, ran toward the car and yelled at her. When Fierros stopped, defendant and Miller got into the backseat. Defendant put a gun to Fierros's head, saying, "If you move, I'll blow your fucking head off." As Miller rifled through Fierros's pockets, defendant hit Fierros in the head with the gun. Fierros struggled as defendant and Miller continued to beat him. Finally, Miller told defendant, "Man, shoot this fool. He ain't got no money." Whereupon defendant shot Fierros and left him to die in the street.

---

[1] Before trial, defendant pleaded guilty to two counts of robbery and one count of attempted robbery arising from incidents that were subsequently proven during the prosecution's case in the penalty phase of the trial. Specifically, these incidents were the robbery of a Riverside National Bank branch, the attempted robbery of another branch of the same bank, and the robbery of a Chino Valley Bank branch. (See *post*, at pp. 1228–1229.) Defendant was sentenced to prison for 13 years eight months for these offenses.

[2] Defendant concedes in his briefing that his own statements and the eyewitness testimony established that he shot the victim while robbing him.

Defendant fled on foot, while Miller and Johnson escaped in Fierros's car. Later, defendant asked Johnson to retrieve Fierros's radio from the stolen vehicle.

Two other witnesses saw the shooting and heard Fierros beg for his life as defendant demanded his money. An autopsy established that Fierros died from a gunshot wound to his chest, and had been badly beaten on the head.

After waiving his *Miranda*[3] rights orally and in writing, defendant made a series of increasingly inculpatory statements to the police, which were audiotaped. Initially, he denied any involvement, saying that he was not even at the scene. Later, he said that Miller asked for his gun but, when he refused, Miller drove away with Fierros and Johnson. Finally, defendant admitted he shot Fierros, but claimed he "meant to hit him, but not kill him." The shooting had been necessary, he asserted, because Fierros was resisting them with "superhuman strength," while defendant could fight with only one arm because of old gunshot wounds.

Defendant also claimed that he had been angry at his mother and had vented his displeasure on Fierros. His mother was a crack cocaine addict whom he had been trying to reform, so that she could "be there" for him and his siblings. That day he had caught her using drugs again. Shooting Fierros was defendant's way of "dealing with family problems." He had not intended to kill Fierros, but Fierros "was in the wrong place at the wrong time when my homeboy was taking care of his business." During a recess, defense counsel, noting that the audiotapes of defendant's statements were being played for the jury, stated that he wished the record to clearly reflect that he was not objecting to their admission, either on voluntariness grounds or "possible *Miranda* violations." The court inquired, "You believe tactically that it benefited your client?" Defense counsel responded, "Yes." The court and counsel were apparently referring to the fact that defendant's extrajudicial statements permitted counsel to attempt to mitigate his guilt without subjecting him to cross-examination.

Defendant did not present evidence in the guilt phase.

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

B.  *Penalty Phase*

1.  *Prosecution Evidence*

a.  *Victim impact testimony*

Evangelina Lozoya lived with Fierros for seven years before his murder. He was the father of her daughter Eva, and filled a paternal role for her other five children. His death affected the entire family. Eva Lozoya, age 10, testified the death made her "feel bad." Fierros was the only person that William Lozoya, age 14, knew as a father, and they enjoyed a good relationship. William testified the family was "no longer happy without him." Corine Lozoya, age 16, described Fierros as a "good father."

The victim's father and two of his brothers also testified to the impact of his death. Fierros was born in Morelito, Mexico, and was one of seven siblings. The impoverished family lived in a one-room house, worked in the fields, and supplemented their income by making sombreros. Fierros was very good to his family. He came to the United States to earn money to pay for his mother's medical bills. The entire family mourned his death. His father felt "that the sky and the earth closed upon me."

b.  *Evidence of defendant's other crimes*

i.  *Juvenile offenses*

In 1988, when defendant was 12 years old, he admitted to a deputy sheriff that he and another boy had placed two BB pistols in another student's locker. In 1991, defendant tried to punch another student. Instead, he hit a campus supervisor who was trying to separate the youngsters. Also in 1991, defendant and another teenager demanded a pizza that Gerardo Laura was delivering. When Laura refused, the boys said, "What if we hit you?" Frightened, Laura handed over the pizza.

ii.  *Assault on his mother*

Kathryn Cole was called by the prosecution as an adverse witness. Before trial she told a district attorney's investigator that in 1993 she had seen defendant argue with his mother and strike her in the mouth. At trial

Ms. Cole, who considered defendant a son, admitted making the statement, but maintained defendant's blow was accidental.

After Fierros's murder, defendant remained at large for 10 months. During this time he committed eight bank robberies and tried to commit a ninth.

### iii. *Robbery of Riverside National Bank*

Defendant pleaded guilty to the August 19, 1994, robbery of a Riverside National Bank branch. Defendant pointed a pistol at teller Tina Paul and screamed that he would kill her unless she gave him her money. Paul pleaded that she had no money in her cash drawer, but defendant continued to scream that he would "blow her fucking head off." Teller Patricia Calvert recognized Paul's plight and gave defendant $5,187 from her drawer. Paul and Calvert identified defendant. Robert G. Chapman, a special agent with the Federal Bureau of Investigation, testified that defendant admitted the robbery, but denied using a gun.

Ms. Paul testified to the lasting impact this experience had upon her. "After it happened, I was afraid to be home alone. Noises that I heard, people just playing in the street or whatever made me remember." She continued: "I can't hear loud notices [*sic*]. Sometimes like my sister will be downstairs and if she makes a loud noise it makes me jump, because I don't know what's happening."

A customer, Virginia Rodriguez, also testified to the lasting impact of the incident. Mrs. Rodriguez was in the bank with four of her children. Her husband was parked outside with their other two children. The two robbers were Black men, who pointed guns at everyone. Mrs. Rodriguez tried to leave, but one of the robbers stopped her. Mrs. Rodriguez and her children, ranging in age from nine to 16, were very frightened. She became even more concerned after the robbers fled because she could not initially find her husband and feared that he had been taken hostage. "It just affected me a lot—because people who are black, I don't have as much confidence in them. Sometimes I see black people near me and I move away from them because I think it's bad."

### iv. *The first Bank of America robbery*

Defendant also pleaded guilty to the September 9, 1994, robbery of a Bank of America branch in Corona. He threatened to shoot teller Edson Lalone

unless he filled a manila envelope with large-denomination bills. He kept his right hand in his pocket, and Lalone assumed he had a gun. Defendant and a female companion ran from the bank with $8,100. According to Agent Chapman, defendant admitted robbing a bank in Corona with Latrina Howard. Howard confirmed that she had been with defendant during the robbery.

Mr. Lalone saw a psychologist after the robbery, and was afraid that defendant would "come back after me."

### v.   *Attempted robbery of Riverside National Bank*

Defendant pleaded guilty to the attempted robbery of a second branch of the Riverside National Bank, again accompanied by Latrina Howard. When defendant told teller Elena Satalan he was robbing her, she explained that she did not have her cashbox because she had been working at the drive-up window. Defendant said, "I have a big fucking gun and I'll blow your fucking head off." The standoff continued for several minutes before defendant and Howard fled.

Ms. Satalan was scared "[e]ven now." She still worked at the bank, but found it frightening to do so.

### vi.   *Robbery of the Chino Valley Bank*

On January 9, 1995, defendant robbed the Chino Valley Bank. Defendant asked teller Rita Lambert to change a $50 bill. When Lambert opened her cash drawer, defendant lifted his shirt, displaying a gun in his waistband, and demanded all of her money. He fled with $2,950. Lambert and another teller identified defendant.

Ms. Lambert had worked at the bank for six years, but no longer did so. She had been present during other robberies, but said this one "hit too close to home." She added: "I didn't realize it until now, and I hate that I feel this way, but I get very uptight and nervous when I see somebody [who] is young and black."

### vii.   *The second Bank of America robbery*

On January 17, 1995, defendant robbed another Bank of America branch. Saying he had a gun, defendant pushed a brown paper bag at teller Jenny

Franco and demanded large-denomination bills. He took $3,720. Franco identified defendant in a photographic lineup and during the penalty phase.

According to Ms. Franco, the robbery "changed my life." On the one hand, it made her "more grateful for each day 'cause you never know what someone can do to you." On the other hand, she suffered from "paranoia" whenever customers approached her window. She felt compelled to continue working at the bank until she completed her schooling.

### viii. *Robbery of City Bank*

On February 16, 1995, defendant took $1,671 from City Bank, saying to the teller: "This is a robbery. Hurry up or else I'm going to kill you." The teller identified defendant, who also admitted the robbery to Agent Chapman.

### ix. *Robbery of Rancho Bank*

On February 22, 1995, defendant robbed a Rancho Bank branch. Teller Melissa Duke saw defendant at Lisa Johnson's window. He kept looking around the bank as Johnson emptied her excess cash drawer. Duke set off the alarm shortly before defendant took $5,920. Defendant was identified by Duke, and admitted the robbery to Agent Chapman.

### x. *Robbery of Union Federal Bank*

Two bank employees tentatively identified defendant as the robber of a Union Federal Bank branch on March 13, 1995. The robber asked teller Sheva Abidian to change a $20 bill, but then demanded all her large-denomination currency. Abidian gave him $1,607. Branch financial manager Stuart Sprenger saw the robber leave the bank. Asked whether defendant was the robber, Abidian testified that he "could be," and Sprenger said he "believed" so.

### xi. *Robbery of Sanwa Bank*

On April 7, 1995, defendant robbed a Sanwa Bank branch. After asking teller Anthony Deku to change a $20 bill, he took out a sack and demanded that Deku fill it with cash. When Deku hesitated, defendant, who had his left hand in his pants pocket, said, "you better fill it up, Brother, or I'll shoot you." Defendant left with $2,711. Deku failed to identify defendant in court. However, two other tellers identified defendant before and during this trial. Moreover, defendant admitted the robbery to Agent Chapman.

### xii. *Other assaults*

Latrina Howard, defendant's girlfriend and accomplice in two of the bank robberies, testified pursuant to a plea bargain. Defendant often hit Howard and pulled a gun on her approximately 20 times. During an argument over what to watch on television, defendant pointed a pistol at Howard's brother. On another occasion, Howard had to talk defendant out of shooting her brother-in-law. He desisted when she pointed out there were witnesses.

### xiii. *Witness intimidation*

After they were arrested for the bank robberies, defendant called Howard, who had been released from custody, and warned her that he had "ways of getting people whether they in jail or not."

Defendant and Rebecca Johnson, the woman with Mr. Fierros when he was murdered, were in adjacent holding cells awaiting trial proceedings. Defendant threatened to kill her when he was released from prison. Anna Garcia was also in the adjacent cell. Defendant told her to warn Johnson "to shut her mouth because [he] would take care of her," that "if she ever made it out she wouldn't make it on the street." Garcia conveyed defendant's threat to Johnson.

During trial, Latrina Howard participated in a three-way telephone conversation with defendant and his brother. The two men said they were "going to do something" to a witness who had testified against defendant.

### 2. *Defense Evidence*

Denise Carr, defendant's mother, testified that she had a single encounter with his father. Defendant never met him and had no other father figures. Ms. Carr did not consume alcohol or use drugs while she was pregnant with defendant, but did so persistently from the time he was 11 or 12. While defendant was growing up, Ms. Carr and her children lived in more than 10 residences belonging to friends or relatives. Defendant looked up to an older boy involved in drug dealing and gang activity. When defendant was 16, Ms. Carr became aware that defendant was selling crack cocaine. Contrary to prosecution testimony (see *ante,* at pp. 1227–1228), defendant had not assaulted Ms. Carr on the occasion she called police. Instead, he had grabbed her after she hit him. Defendant was not responsible for her facial injury.

Defendant was expelled from school in the 11th grade. Ms. Carr took defendant's daughter to visit him in jail. The two year old knew her father and had fun with him when she visited. Asked what effect defendant's execution would have on her, Ms. Carr said she would just have to "stay strong" for the sake of her daughter and granddaughter.[4]

Vernita Lynch, defendant's maternal aunt, testified that she loved defendant and was a "mother figure" to him. Beatrice McClain, defendant's maternal grandmother, testified that she provided a home for him and his siblings for two years when his mother was using drugs. After defendant left, Ms. McClain continued to see him almost daily and loved him very much. Both women testified that defendant's execution would be painful for them.

Lakeshia Cook, defendant's sister, testified that she loved him because he had "always been there for me when I didn't have a daddy." With no father and a drug-addicted mother, defendant "had to steal for me and my brother so we could survive." His execution would affect her badly.

Bonnie Jackson was another surrogate mother who sheltered defendant and his siblings when their mother was on drugs. She testified that he was "real smart, articulate, and he was always strong, tried to make a good situation out of a bad all the time, because he loved his brother and sister," and tried to take care of them. Ms. Jackson loved defendant very much and feared that his execution would cause her to have another stroke.

Clyde Stewart, a former corrections officer and parole agent, ran a residential facility for juvenile offenders. Stewart testified that because of the serious records of the boys he accepted, his facility was considered a final alternative to a California Youth Authority commitment. Defendant was confined there for over a year. He was easy to get along with and Stewart grew to like him. Defendant's execution "would hurt me and make me sad to know that his life ended at such a young age."

---

[4] At the conclusion of his mother's cross-examination, for no apparent reason, defendant "threw his chair backwards, knocked it over," left the courtroom, and went to the holding cell. At the request of the defense, the court took a recess to give him an opportunity to regain his composure. Subsequently, the bailiff requested, out of the jury's presence, to restrain defendant with a "leg brace." The court found the restraint reasonable under the circumstances, and noted the leg brace was covered by defendant's pants and could not be seen by the jury. Defendant does not raise this matter on appeal.

## II. DISCUSSION

### A. *Pretrial and Guilt Phase Issues*

#### 1. *Excusal of a Prospective Juror for Cause*

Defendant contends the excusal of Prospective Juror C.S. (C.S.) for cause violated his rights to due process, a fair trial, an impartial jury, and a reliable penalty verdict.[5]

Under *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844], we review the record to determine whether it fairly supports the trial court's determination that C.S.'s views on the death penalty would have prevented or substantially impaired the performance of her duties as a juror. (*People v. Bunyard* (2009) 45 Cal.4th 836, 845 [89 Cal.Rptr.3d 264, 200 P.3d 879]; *People v. Roldan* (2005) 35 Cal.4th 646, 696 [27 Cal.Rptr.3d 360, 110 P.3d 289]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1094 [31 Cal.Rptr.2d 321, 875 P.2d 36].) We conclude it does.

C.S.'s responses on the juror questionnaire were somewhat equivocal. On a scale of one to a high of 10, she rated herself a "3" in opposition to the death penalty. In response to another question, she indicated that she thought the death penalty was imposed "too often." Asked whether her opinion would make it difficult for her to vote for the death penalty, regardless of the evidence, she circled "no." She also circled "no" when asked whether she was so strongly opposed to the death penalty that she would always vote against death, regardless of aggravating or mitigating evidence.

Asked whether she could impose the death penalty for felony murder, she circled "no." But when asked whether she would automatically vote for life in prison without possibility of parole, if the killing was unintentional or accidental, she wrote "probably." Asked whether she could impose the death penalty, depending on the circumstances of the case and the evidence presented in the penalty phase, if the special circumstance of murder in the commission of robbery were proven, she circled "yes," but again added "probably."

---

[5] Defendant relies upon the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and the corresponding provisions of the California Constitution.

Finally, she circled "no" when asked whether, if she were selected as the foreperson, and if the evidence justified that verdict, she could personally sign a death verdict form. The prosecutor pursued this response on voir dire.

The prosecutor asked the entire panel of prospective jurors whether they felt that they would be able to return a death verdict and affirm that they had done so. "Finally, there was one question on the questionnaire that asked you as jurors whether or not you could personally sign the verdict as the foreperson in the penalty phase of this case. Now, when you were sitting down in the jury room filling out the questionnaires, that was sort of an abstract thinking process. Now, we're sitting in the courtroom. There's a person seated in the courtroom against whom murder charges have been filed and against whom I'm pressing the death penalty. Is there anyone who feels they could not return this if justice demanded it and say, 'Yes, I voted for the death of this person.' " One prospective juror indicated she would be unable to do so. The prosecutor then asked C.S. whether she could, noting that she had in her questionnaire indicated "some concerns." C.S. responded, "I'm just really not sure. I've never been put in a place to make a decision. I think it would just depend on all of the circumstances. It would [be] difficult. I don't know."

The prosecutor challenged C.S. for cause. "[S]he indicated she could not say if she could come into a courtroom and vote for death." The court observed, "She also didn't say that she was going to do the opposite." Defense counsel objected, "She was uncertain whether she could—as to the specific question whether she could sign the death certificate, I think that's a different issue than saying—" The prosecutor responded, "Initially, I asked that question, but at the very end I asked whether or not they could come into the courtroom and state, which they would be required to do if they were jurors, vote for death, and I think I'm entitled to have jurors that say at the outset they could return a verdict for death under the appropriate circumstances. She could not say that. She said she didn't know if she could do it."

The trial court excused C.S. Considering her responses on voir dire, as well as her answers to the questionnaire, the court found that her views on the death penalty "would prevent or substantially impair the performance of her duties as a juror in accordance with the instructions." The court added: "I believe she was trying to be accommodating, but in the final analysis her views are too strong for her to be a fair and impartial observer."

The trial court's finding is supported by substantial evidence.

"Generally, a trial court's rulings on motions to exclude for cause are afforded deference on appeal, for 'appellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record.' [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 529 [43 Cal.Rptr.3d 1, 133 P.3d 1076].)

■ A finding of bias "may be upheld even in the absence of clear statements from the juror that he or she is impaired because 'many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.' [*Wainwright v. Witt, supra*, 469 U.S. at pp.] 424–425. Thus, when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, is entitled to resolve it in favor of the State.' *Id.*, at 434." (*Uttecht v. Brown* (2007) 551 U.S. 1, 7 [167 L.Ed.2d 1014, 127 S.Ct. 2218]; see *People v. Wilson* (2008) 44 Cal.4th 758, 779 [80 Cal.Rptr.3d 211, 187 P.3d 1041] (*Wilson*).)

■ Defendant's reliance on *People v. Chacon* (1968) 69 Cal.2d 765 [73 Cal.Rptr. 10, 447 P.2d 106] is misplaced. In *Chacon*, this court found that three jurors were erroneously excused for cause. They were dismissed "when they answered that they 'would not be able to sign the [death] verdict as foreman.' That answer indicated that they would not undertake what they regarded as the greater moral burden of the jury foreman, but it did not show that they would have refused to vote for the death penalty." (*Id.* at p. 772.) While the juror questionnaire here did refer to signing the verdict as foreperson, the prosecutor's question on voir dire was not so limited. "Is there anyone who feels they could not return [a death verdict] if justice demanded it and say, 'Yes, I voted for the death of this person.' " The predicate of the question was sound. Jurors must be prepared to affirm their verdicts.[6]

---

[6] Penal Code section 1149 provides: "When the jury appear they must be asked by the Court, or Clerk, whether they have agreed upon their verdict, and if the foreman answers in the affirmative, they must, on being required, declare the same."

Penal Code section 1163 provides: "When a verdict is rendered, and before it is recorded, the jury may be polled, at the request of either party, in which case they must be severally asked whether it is their verdict, and if any one answer in the negative, the jury must be sent out for further deliberation."

Defendant complains that the prosecutor's question was unclear, that C.S. was not told that if she was selected as a juror, she would not have to serve as the foreperson. Defendant did not make this argument below or seek to clarify the matter during his own voir dire of C.S. As noted, the line of prosecution inquiry was broader. Furthermore, even when the precise wording of a single question, and the answer given, do not compel a conclusion of substantial impairment, "the need to defer to the trial court remains because so much may turn on a potential juror's demeanor." (*Uttecht v. Brown, supra,* 551 U.S. at p. 8; see *Wilson, supra,* 44 Cal.4th at p. 780.)[7]

Defendant's briefing extensively parses C.S.'s responses on the question-naire and argues that none of them would have supported a finding of impairment. However, unlike the trial court in *People v. Stewart* (2004) 33 Cal.4th 425 [15 Cal.Rptr.3d 656, 93 P.3d 271], a case upon which defendant repeatedly relies, this trial court did not excuse C.S. "based solely upon problematically-phrased jury questionnaire responses and without conducting an in-court voir dire examination of the excused panelists." (*People v. Robinson* (2005) 37 Cal.4th 592, 619, fn. 13 [36 Cal.Rptr.3d 760, 124 P.3d 363].)

## 2. *Murder Instructions*

An amended information alleged that defendant committed murder with malice (Pen. Code, § 187, subd. (a))[8] and while engaged in the commission of a robbery (§ 211). It also charged defendant with using a firearm in the commission of the murder. At the close of the guilt phase, the jury was instructed on premeditated murder and felony murder.

Defendant contends the instructions were erroneous because the information did not charge him with first degree murder. He claims that by the prosecutor's

---

[7] At oral argument defendant invited us to reconsider this rule. In the absence of authority to the contrary, we decline to do so. Relying on *Snyder v. Louisiana* (2008) 552 U.S. 472 [170 L.Ed.2d 175, 128 S.Ct. 1203], counsel argued that deference to the trial court is inappropriate unless the court expressly states that it is excusing the juror on the basis of demeanor. *Snyder* said no such thing. Applying *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712], the *Snyder* court reviewed the use of peremptory strikes by a prosecutor to eliminate Black prospective jurors. The question in *Snyder* was not whether the court relied on the prospective juror's demeanor in excusing him, but rather whether the prosecutor was truthful when he claimed to rely on the prospective juror's demeanor in striking him. The prosecutor said that he struck the prospective juror because he appeared very nervous. The high court held that deference to the trial court is "especially" appropriate when the judge actually makes a determination that an attorney relied on demeanor in exercising a strike. The court did not hold that deference is permissible only when such an express determination was made below. (*Snyder, supra,* 552 U.S. at p. 479 [128 S.Ct. at p. 1209].)

[8] Further statutory references are to the Penal Code, unless otherwise indicated.

failing to allege that the murder under either theory was first degree murder, he was effectively charged with murder in the second degree.[9]

■ Defendant's argument rests on the premise that *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] (*Dillon*) implicitly overruled the long-standing precedent of *People v. Witt* (1915) 170 Cal. 104 [148 P. 928], in which we held that a defendant may be convicted of felony murder even though the information charged only murder with malice. We have repeatedly rejected this construction of *Dillon*, most recently in *People v. Hawthorne* (2009) 46 Cal.4th 67 [92 Cal.Rptr.3d 330, 205 P.3d 245].

In *People v. Harris* (2008) 43 Cal.4th 1269 [78 Cal.Rptr.3d 295, 185 P.3d 727] (*Harris*), as in this case, the defendant argued it was error to instruct the jury on first degree murder because the information charged him only with murder in violation of section 187, subdivision (a), which Harris characterized as a statute defining second degree murder. We stated: "Defendant claims the court lacked jurisdiction to try him for first degree murder. He recognizes that we have repeatedly held that an information charging murder in violation of section 187 is sufficient to support a first degree murder conviction. (*People v. Hughes* (2002) 27 Cal.4th 287, 369 [116 Cal.Rptr.2d 401, 39 P.3d 432], citing cases; see also *People v. Geier* (2007) 41 Cal.4th 555, 591 [61 Cal.Rptr.3d 580, 161 P.3d 104]; *People v. Carey* (2007) 41 Cal.4th 109, 131–132 [59 Cal.Rptr.3d 172, 158 P.3d 743].) However, he claims the rationale of these cases is irreconcilable with the holding of *People v. Dillon*[, *supra*,] 34 Cal.3d 441 . . . (*Dillon*).

■ "*Dillon* held that section 189 is a codification of the first degree felony-murder rule. (*Dillon*, *supra*, 34 Cal.3d at pp. 471–472.) Because there is only a single statutory offense of first degree murder (see, e.g., *People v. Geier*, *supra*, 41 Cal.4th at p. 591), defendant reasons that the relevant statute must be section 189, not section 187, which he construes as a definition of second degree murder.[10] Defendant misreads both *Dillon* and the statutes.

---

[9] Defendant asserts: "Both the statutory reference ('Section 187 of the Penal Code') and the description of the crime ('did willfully, unlawfully, and with malice aforethought murder') establish that [defendant] was charged exclusively with second degree malice murder in violation of Penal Code section 187, not with first degree murder in violation of Penal Code section 189."

[10] "Section 187 provides, in relevant part: 'Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.'

"Section 189 provides, in relevant part: 'All murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder

*Dillon* made it clear that section 189 serves *both* a degree-fixing function and the function of establishing the offense of first degree felony murder. (*Dillon*, at pp. 468, 471.) It defines second degree murder as well as first degree murder. Section 187 also includes both degrees of murder in a more general formulation. (*People v. Witt*[, *supra*,] 170 Cal. 104, 108 . . . .) Thus, an information charging murder in the terms of section 187 is 'sufficient to charge murder in any degree.' (*People v. Carey*, *supra*, 41 Cal.4th at p. 132.)" (*Harris*, *supra*, 43 Cal.4th at pp. 1294–1295.)

Defendant also contends that the jury should have been required to agree unanimously on whether he committed premeditated murder or felony murder. This argument, too, has been repeatedly rejected. (See, e.g., *People v. Nakahara* (2003) 30 Cal.4th 705, 712 [134 Cal.Rptr.2d 223, 68 P.3d 1190].) Even if we were to accept defendant's argument, which we do not do, the record offers him no support. The jury here unanimously found true a felony-murder special circumstance, demonstrating that that theory of first degree murder garnered the agreement of each juror. (See *People v. Cleveland* (2004) 32 Cal.4th 704, 751 [11 Cal.Rptr.3d 236, 86 P.3d 302].)

Finally, defendant contends the information failed to allege all the facts necessary to justify the death penalty, making it defective under *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*). We rejected this claim, too, in *Harris*, *supra*, 43 Cal.4th 1269. "The *Apprendi* claim is illusory; the information included special circumstance allegations that fully supported the penalty verdict." (*Id.* at p. 1295.)

### B. Penalty Phase Issues

#### 1. Evidence of Violent Juvenile Misconduct

■ Section 190.3, factor (b) provides that in determining whether to impose the death penalty or life without possibility of parole, the trier of fact may take into consideration the "presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

Among the acts of violent misconduct admitted against defendant were three unadjudicated incidents committed while he was a juvenile: the pizza robbery; the campus supervisor assault; and the assault on his mother. (See *ante*, at pp. 1227–1228.)

---

which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree. All other kinds of murders are of the second degree.' " (*Harris*, *supra*, 43 Cal.4th at p. 1295, fn. 7.)

It is well established the federal Constitution does not bar consideration of unadjudicated criminal offenses. (See, e.g., *Tuilaepa v. California* (1994) 512 U.S. 967, 976–977 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Dickey* (2005) 35 Cal.4th 884, 928 [28 Cal.Rptr.3d 647, 111 P.3d 921].) Moreover, evidence of violent juvenile misconduct that would have been a crime if committed as an adult is admissible under section 190.3, factor (b). (*People v. Avena* (1996) 13 Cal.4th 394, 426 [53 Cal.Rptr.2d 301, 916 P.2d 1000]; *People v. Visciotti* (1992) 2 Cal.4th 1, 72 [5 Cal.Rptr.2d 495, 825 P.2d 388].)

Nevertheless, relying on *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1, 125 S.Ct. 1183], defendant contends that admission of these unadjudicated juvenile offenses denied him his rights to due process, a fair trial by an impartial and unanimous jury, the presumption of innocence, effective confrontation of witnesses, effective assistance of counsel, equal protection, and a reliable penalty determination.[11]

■ Defendant's reliance on *Roper v. Simmons, supra*, 543 U.S. 551, is badly misplaced. That case holds that the execution of individuals who were under 18 years of age at the time of their capital crimes is prohibited by the Eighth and Fourteenth Amendments. It says nothing about the propriety of permitting a capital jury, trying an adult, to consider evidence of violent offenses committed when the defendant was a juvenile. An Eighth Amendment analysis hinges upon whether there is a national consensus in this country against a particular punishment. (*Roper v. Simmons, supra*, 543 U.S. at pp. 562–567; *People v. Blair* (2005) 36 Cal.4th 686, 754–755 [31 Cal.Rptr.3d 485, 115 P.3d 1145].) Defendant's challenge here is to the admissibility of evidence, not the imposition of punishment.

Defendant also claims the trial court erred in admitting evidence of a fourth incident of juvenile misconduct, bringing BB guns onto school grounds when he was 12 years old. (See *ante*, at p. 1227.) He contends the evidence was improper, not only because the conduct was not criminal as required by section 190.3, factor (b), but also because it did not involve "the express or implied threat to use force or violence." The Attorney General concedes this would not have been a crime at the time of defendant's conduct.[12] However, he argues that any error was harmless. We agree. In light of the admissible evidence of defendant's prior violent crimes as an adult, including his eight armed robberies, there can be no reasonable possibility that evidence of the BB gun incident was prejudicial. (*People v. Medina* (1995) 11 Cal.4th 694, 767 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Pinholster* (1992) 1 Cal.4th 865, 963 [4 Cal.Rptr.2d 765, 824 P.2d 571].)

---

[11] Defendant relies upon the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

[12] For the current state of the law, see the Gun-Free School Zone Act of 1995. (§ 626.9.)

## 2. *Victim Impact Evidence*

### a. *The Testimony of the Victim's Family*

The victim's family members, both from Mexico and the United States, testified about the lasting impact of his murder. (See *ante*, at p. 1227.) Defendant contends the admission of this evidence violated his state and federal rights to due process and a reliable penalty determination. The contention lacks merit.

■ "Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a)." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056–1057 [47 Cal.Rptr.3d 467, 140 P.3d 775].) "The federal Constitution bars victim impact evidence only if it is 'so unduly prejudicial' as to render the trial 'fundamentally unfair.' " (*Id.* at p. 1056, quoting *Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597].) The victim testimony clearly satisfied this standard. Contrary to defendant's claim, victim impact evidence is not limited to circumstances known or foreseeable to the defendant at the time of the crime. (E.g., *Lewis and Oliver, supra*, 39 Cal.4th at p. 1057.)

### b. *The Videotape*

Defendant contends a videotape shown by the prosecution "played unfairly to the jury's emotions, and was clearly prejudicial."

We have viewed the videotape. It is a montage of fewer than 20 still photographs. The photographs depict a young Mr. Fierros, his family, his hometown in Mexico, and his family's humble residence. With the exception of a studio portrait of Fierros as a teenager, the photographs are snapshots of very poor quality.

"Trial courts must be very cautious about admitting [victim impact] videotape evidence." (*People v. Kelly* (2007) 42 Cal.4th 763, 798 [68 Cal.Rptr.3d 531, 171 P.3d 548] (*Kelly*).) In particular, we have cautioned against the admission of "lengthy" videotapes. (*People v. Prince* (2007) 40 Cal.4th 1179, 1289 [57 Cal.Rptr.3d 543, 156 P.3d 1015] (*Prince*).) However, the videotape here was less than three minutes long. By contrast, we have upheld the admission of much longer videotapes. (See, e.g., *People v. Zamudio* (2008) 43 Cal.4th 327, 363–368 [75 Cal.Rptr.3d 289, 181 P.3d 105] [14 minutes]; *Kelly, supra*, 42 Cal.4th at pp. 793–799 [20 minutes]; *Prince, supra*, 40 Cal.4th at pp. 1286–1291 [25 minutes].) ·

Considering Evidence Code section 352, the trial court held that any potentially prejudicial impact did not outweigh the tape's probative value. The court noted that all of the photographs used in the videotape montage had already been admitted into evidence as still photographs during the testimony of the victim's brother, Nabor. As the court observed, the videotape was simply "a repackaging of the evidence." Defendant had not objected to the admission of the still photographs themselves.

The trial court did not abuse its discretion. The videotape was not unduly emotional. It merely presented admitted evidence in a different medium, unenhanced by any soundtrack or commentary. The few grainy family photographs simply "humanized" the victim, "as victim impact evidence is designed to do." (*Kelly, supra*, 42 Cal.4th at p. 797.)

### c. The Testimony of the Bank Robbery Victims

Victims of defendant's uncharged bank robberies testified as to the continuing impact of the crimes upon them. (See *ante*, at pp. 1228–1230.) Defendant contends that although evidence of a defendant's commission of prior violent acts is admissible, evidence of the impacts of those crimes is not. To the contrary, "the circumstances of the uncharged violent criminal conduct, including its direct impact on the victim or victims of that conduct, are admissible under [section 190.3,] factor (b). [Citations.]" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 39 [45 Cal.Rptr.3d 407, 137 P.3d 229].)

Finally, defendant contends that the prosecution appealed to racial prejudice through the testimony of victims Rita Lambert and Virginia Rodriguez. Ms. Lambert, the teller robbed at Chino Valley Bank, testified that because of the robbery she no longer worked at a bank. She added: "I didn't realize it until now, and I hate that I feel this way, but I get very uptight and nervous when I see somebody [who] is young and black." Ms. Rodriguez, along with four of her children, was prevented at gunpoint from leaving Riverside National Bank during the robbery. She also feared that her husband, who had remained outside the bank with their other two children, might have been taken hostage. Ms. Rodriguez testified that, "It just affected me a lot— because people who are black, I don't have as much confidence in them. Sometimes I see black people near me and I move away from them because I think it's bad."

While a showing of bad faith is no longer required to prove prosecutorial misconduct,[13] we note there is no reason to believe the prosecutor intended to elicit racial remarks or appeal to racial prejudice, or that the testimony had

---

[13] *People v. Hill* (1998) 17 Cal.4th 800, 802 [72 Cal.Rptr.2d 656, 952 P.2d 673].

such an effect. To the contrary, Ms. Lambert's remark likely came as a surprise to the prosecutor because Lambert prefaced it by saying that she didn't realize until that moment that she felt that way. In any event, this claim was forfeited. Defendant did not object to either comment, nor did he request an admonition when doing so would have cured any prejudice. (See, e.g., *People v. Bennett* (2009) 45 Cal.4th 577, 616 [88 Cal.Rptr.3d 131, 199 P.3d 535].) Moreover, there was no prejudice. The prosecutor did not mention these brief and isolated statements in oral argument or otherwise try to capitalize on them. The record forecloses any possible Eighth Amendment claim as well.

### 3. *Asserted Prosecutorial Misconduct*

Defendant contends the prosecutor engaged in misconduct during her penalty phase argument, thereby violating his state and federal constitutional rights to confrontation, a fair trial, due process, and a reliable verdict.[14]

Defendant's first claim involves the prosecutor's reading of an excerpt from a magazine article. Before argument the trial court overruled defendant's objection to the excerpt. Therefore, any fault in this regard would be judicial error, not prosecutorial misconduct. (*People v. Riggs* (2008) 44 Cal.4th 248, 325, fn. 40 [79 Cal.Rptr.3d 648, 187 P.3d 363].) We conclude, however, there was no error.

■ This court has repeatedly held that in closing argument attorneys may use illustrations drawn from common experience, history, or literature. (E.g., *People v. Harrison* (2005) 35 Cal.4th 208, 248 [25 Cal.Rptr.3d 224, 106 P.3d 895].) Here, the prosecutor read a passage from a magazine article entitled, *Sorry I Killed You, but I Had a Bad Childhood.*[15] Defendant contends this excerpt "was used by the prosecutor to improperly attack the very legitimacy of mitigating evidence and to undermine the important role such evidence plays in guiding the jury's sentencing discretion in a capital case."

To the contrary, the excerpt was simply one more literary effort to frame the age-old argument about free will and determinism, and to make the case for assigning greater weight to free will and personal responsibility in fixing blame and punishment.[16] Had the prosecutor made substantially the same

---

[14] Defendant relies on the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution as well as on article I, sections 7, 15, and 17 of the California Constitution.

[15] The prosecutor was not permitted to identify the author, James Q. Wilson, or note that the article appeared in the June 1997 issue of *California Lawyer.*

[16] The excerpt read: " 'Many of us believe there has been a decline in willingness of citizens to assume personal responsibility for their actions. It seems we are now more likely to deny guilt, to expect rewards without efforts, to blame society for individual failings, and to exploit

points without reading them from an unidentified source quoting an unidentified author, the argument would have been acceptable also. Just as in *People v. Mayfield* (1997) 14 Cal.4th 668 [60 Cal.Rptr.2d 1, 928 P.2d 485] (*Mayfield*) the prosecutor's argument relying on that excerpt could not reasonably have been understood by the jury as overriding the standard instructions it was given concerning the aggravating and mitigating factors to be considered in reaching its sentencing decision.[17] In *Mayfield*, we found no misconduct in the prosecutor's argument that if the jurors "allowed sympathy for the defendant to overwhelm them, 'we might as well do away with the death penalty.' " (14 Cal.4th at p. 801.) "A reasonable juror would not have understood this argument as an assertion, contrary to the court's instructions, that sympathy for the defendant could not be considered. Rather, a reasonable juror would have understood the prosecutor's argument to be that sympathy for the defendant should not be the exclusive penalty consideration and that in judging the weight to be given sympathy as a mitigating circumstance, the jurors should give relatively little weight to a showing that any capital defendant might be expected to make—for instance, that the defendant's execution would inflict suffering on his or her parents and close relatives. This argument was not improper. [Citation.]" (*Ibid.*)

Defendant also claims that the prosecutor committed misconduct in arguing to the jury that defendant would pose a danger to inmates and staff if he were sentenced to life in prison without possibility of parole.

---

legal technicalities to avoid moral culpability. There is a sense, too, that the legal system has become excessively tolerant of 'abuse excuses' in which social causes and mental conditions are used to explain and ultimately excuse criminal behavior.

" 'In each of us there is a tension between the desire to judge and the desire to explain human behavior. Unless the law proceeds carefully, it risks placing its finger too heavily on one side of that tension, typically the explanatory side, so that juries are more likely to explain and consequently accept abuse excuses and less likely to judge the defendant's actions.

" 'The central failing of American criminal law is the blurring of boundaries between imperfect social science, which seeks to explain behavior, and the law, which seeks to judge it.

" 'Our society clings stubbornly to the idea of personal responsibility. To do otherwise is to invite an absurdity: if all behavior is caused by factors beyond the individual's control, and if people cannot be blamed for actions beyond their control, then nobody can be blamed for anything. [And t]his result strikes almost everybody as ridiculous, so we reject it.

" 'When we insist on personal accountability, we insist that people beyond a certain age are moral agents. If they break the law and cannot reasonably claim one of a small number of offenses [*sic*: defenses], they ought to be held accountable. Not only does this view satisfy our moral conviction that people should be responsible for their actions, but it also serves two practical functions. It sends a message to children learning how to behave that they ought to acquire those habits and beliefs that will facilitate their conformity to the essential rules of civilized conduct. A strict view of personal accountability also sends a message to individuals choosing between alternative courses of action that there are likely important consequences of making [certain bad choices].' " (See Wilson, *Sorry I Killed You, but I Had a Bad Childhood* (June 1997) Cal. Law. 43–44.)

[17] As we discuss below (see *post*, at pp. 1248–1250), the court gave the pattern jury instructions CALJIC Nos. 8.85 and 8.88.

██ Assertions of future dangerousness are permissible if supported by the evidence and not based on expert opinion. (E.g., *People v. Navarette* (2003) 30 Cal.4th 458, 518–519 [133 Cal.Rptr.2d 89, 66 P.3d 1182].) Here, there was ample evidence that defendant had, while in custody himself, threatened incarcerated witnesses. He warned Latrina Howard that he had "ways of getting people whether they in jail or not." (See *ante*, at p. 1231.) He also threatened Rebecca Johnson directly and through Anna Garcia. (*Ibid.*) Latrina Howard's testimony tended to confirm this threat. She participated in a conversation in which defendant and his brother said they were "going to do something" to a witness who had testified against him. (*Ibid.*) The jury was entitled to infer that the woman they were referring to was Ms. Johnson.

██ Defendant objects that no evidence was presented that defendant had acted on these threats. True. However, given the overwhelming evidence of defendant's past violence (see *ante*, at pp. 1227–1231), the prosecutor had ample basis on which to argue that he would make good on his threats if given the opportunity.[18] Defendant also assigns as misconduct the prosecutor's suggestion that specific individuals[19] were in prison and so in a position to carry out defendant's threats. However, the court sustained objections to this line of argument. We assume the jury heeded the court's rulings. (E.g., *People v. Stitely* (2005) 35 Cal.4th 514 [26 Cal.Rptr.3d 1, 108 P.3d 182].)

### 4. *Instructions on Victim Impact Evidence*

Defendant contends the jury was not properly instructed on the use of victim impact evidence.

In accordance with CALJIC No. 8.84.1, the jury was instructed in pertinent part that "[y]ou must neither be influenced by bias nor prejudice against the defendant, nor swayed by public opinion or public feelings. Both the People and the defendant have the right to expect that you will consider all the evidence, follow the law, exercise your discretion consciously [*sic*], and reach a just verdict."

On appeal, defendant contends the trial court should have given the following instruction sua sponte: "Victim-impact evidence is simply another

---

[18] In a request for judicial notice filed on December 5, 2007, defendant asks us to notice the testimony of Rebecca Johnson in another case, the prosecution of defendant's confederate Anthony Miller. There, she apparently testified that Miller, not defendant, assaulted her after she testified in defendant's case here. We deny the request. Defendant makes it to support his claim that the prosecutor here committed misconduct by eliciting testimony from Johnson concerning the assault. There was no misconduct. Johnson did not say that defendant was the person who assaulted her. Moreover, the jury was instructed that the testimony was admitted only to explain why Johnson might be reluctant to testify in this case, and that it should not be considered against defendant unless the assault was somehow tied to him.

[19] Defendant's father, a cousin, and a gang member nicknamed "Monster Cody."

method of informing you about the nature and circumstances of the crime in question. You may consider this evidence in determining an appropriate punishment. However, the law does not deem the life of one victim more valuable than another; rather, victim-impact evidence shows that the victim, like the defendant, is a unique individual. Your consideration must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence. Finally, a victim-impact witness is precluded from expressing an opinion on capital punishment and, therefore, jurors must draw no inference whatsoever by a witness's silence in that regard."

■ We recently considered this instruction and concluded it is neither required nor appropriate. (*People v. Zamudio, supra,* 43 Cal.4th 327, 369–370.) "Insofar as this proposed instruction is legally correct, it would not have provided the jurors with any information they did not otherwise learn from CALJIC No. 8.84.1. Moreover, because jurors may, in considering the impact of a defendant's crimes, 'exercise sympathy for the defendant's murder victims and . . . their bereaved family members' [citation], the proposed instruction is incorrect in suggesting that a juror's 'emotional response' to the evidence may play no part in the decision to vote for the death penalty. [¶] The first two sentences of the proposed instruction were adequately covered by another instruction the trial court gave, CALJIC No. 8.85. In this regard, the trial court instructed the jury to 'consider, take into account, and be guided by,' among other factors, 'the circumstances of the crime of which the defendant was convicted in the present proceeding.' We have held that this instruction adequately 'instruct[s] the jury how to consider' victim impact evidence. [Citation.] [¶] The remainder of the proposed instruction, even if we assume it to be legally correct, is not the type to give rise to a sua sponte duty to instruct. ■ A trial court must instruct sua sponte 'only on those general principles of law that are closely and openly connected with the facts before the court and *necessary for the jury's understanding of the case.* [Citation.]' [Citation.] Instructions informing the jurors that the law does not deem the life of one victim more valuable than another, and cautioning them not to draw an adverse inference from a victim impact witness's silence regarding capital punishment, were not necessary to the jury's understanding of this case. Therefore, the trial court had no sua sponte duty to give such instructions. [Citations.]" (*Ibid.,* fn. omitted.)

### 5. *Instruction on Governor's Commutation Power*

■ During penalty phase deliberations, the jury submitted the following written question to the court: "Does a conviction and sentence of Life without possibility of parole mean there is <u>no</u> future possibility of parole regardless of future changes of Law or Legal precident [*sic*]?" The court advised counsel

that it was inclined to answer the question by mentioning the Governor's power of commutation, while emphasizing it should not be considered in determining the appropriate sentence. Defense counsel expressed her approval of this answer, as did the prosecutor. The court consulted counsel again after committing the proposed answer to writing. The instruction read: "The governor of the State of California has the power to commute or modify a sentence. This power applies to both life without possibility of parole and the death sentence. It would be a violation of your duty as a juror to consider the possibilities of such commutation of an appropriate sentence." Defense counsel again expressed agreement: "Meets with the defense approval." The court then directed that the instruction be sent in to the jury.

The Attorney General contends the doctrine of invited error bars defendant from challenging the instruction on appeal. We need not reach this question because the instruction was not erroneous.

■■■ A trial court in a capital case does not err when it answers a jury question generally related to the commutation power by instructing that the Governor may commute either a death sentence or a life without possibility of parole sentence, but that the jury must not consider the possibility of commutation in determining the appropriate sentence. (*People v. Hines* (1997) 15 Cal.4th 997, 1073 [64 Cal.Rptr.2d 594, 938 P.2d 388] (*Hines*); *People v. Ramos* (1984) 37 Cal.3d 136, 159, fn. 12 [207 Cal.Rptr. 800, 689 P.2d 430] (*Ramos*).)

Relying on *Coleman v. Calderon* (9th Cir. 2000) 210 F.3d 1047 (*Coleman II*), defendant contends that, given his three prior convictions, the instruction was erroneous because it failed to inform the jury that commutation was possible for a twice-convicted felon only upon the recommendation of four justices of this court (see Cal. Const., art. V, § 8, subd. (a)) and only upon consultation with the Board of Prison Terms (§§ 4802, 4812, 4813).

In *Coleman II*, the Ninth Circuit held that the instruction given there was prejudicially misleading because it "suggested the Governor could, at his sole discretion, commute a sentence from life imprisonment without the possibility of parole to some lesser sentence that would include the possibility of parole." (*Coleman II, supra*, 210 F.3d at p. 1050.)

*Coleman II* is distinguishable. Unlike in this case, the instruction in *Coleman II* was not given in response to a jury question. (*People v. Coleman* (1988) 46 Cal.3d 749, 780–781 [251 Cal.Rptr. 83, 759 P.2d 1260].) Rather, it was a then standard instruction given because section 190.3 required that a penalty phase jury be instructed that a sentence of life imprisonment without possibility of parole can be modified or commuted by the Governor. In *Ramos*,

*supra*, 37 Cal.3d 136, this court held that such an instruction violated the due process clause of the California Constitution. (*Ramos*, at pp. 150–159.) However, the *Ramos* court itself noted that when the jury raises the commutation issue, the matter cannot be avoided and is best handled by the sort of instruction given here. (*Id.* at p. 159, fn. 12.)

Moreover, as we have stated repeatedly, there is no reason to mention the restrictions on the Governor's power of commutation because they are irrelevant to the jury's determination, and there is good reason not to stress a defendant's record. (*People v. Beames* (2007) 40 Cal.4th 907, 932 [55 Cal.Rptr.3d 865, 153 P.3d 955] (*Beames*); *Hines, supra*, 15 Cal.4th at p. 1074; *People v. Carpenter* (1997) 15 Cal.4th 312, 360 [63 Cal.Rptr.2d 1, 935 P.2d 708].) In *People v. Hart* (1999) 20 Cal.4th 546 [85 Cal.Rptr.2d 132, 976 P.2d 683], we reaffirmed this view and declined to follow the Ninth Circuit's contrary authority in, among other cases, *Coleman v. Calderon* (9th Cir. 1998) 150 F.3d 1105. (*Hart*, at pp. 654–657.)

The *Coleman II* court further held that the standard instruction in that case was constitutionally infirm because it invited the jury to speculate that the only way to prevent the defendant's release was to sentence him to death. (*Coleman II, supra*, 210 F.3d at pp. 1050–1051.) The instruction given here certainly did not invite the jury to engage in such speculation. To the contrary, the jury was admonished that considering the possibility of commutation would be a violation of its oath. Absent any contrary indication, we presume the jury followed the instruction. (See, e.g., *People v. Gray* (2005) 37 Cal.4th 168, 217 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

Defendant next contends the instruction given here was erroneous because the jury's question did not directly raise the issue of commutation. We have recently rejected this argument. "Defendant asserts the trial court should not have instructed on commutation, because the jury did not specifically ask about the Governor's commutation power but, rather, inquired about parole. We have held, however, that commutation instructions are properly given when the jury *implicitly* raises the issue of commutation. [Citations.]" (*Beames, supra*, 40 Cal.4th at p. 932.) The point is that jurors are not concerned about the distinction between parole and commutation. They are simply interested in the bottom line: Will the defendant ever be released from prison?

While the instruction given by the court appropriately responded to the commutation issue implicit in the jury's question, defendant contends the instruction requires reversal because it failed to address the issue that was raised explicitly: whether defendant might be paroled as a result of future legislative or judicial action. It would have been proper for the court to tell

the jury that in unusual cases, future action by the Legislature or the courts might result in the parole of a defendant who has been sentenced either to death or to life without possibility of parole, but that the jury should not speculate on such possibility and instead should assume the sentence it reaches will be carried out. (*People v. Perry* (2006) 38 Cal.4th 302, 321–322 [42 Cal.Rptr.3d 30, 132 P.3d 235]; *People v. Kipp* (1998) 18 Cal.4th 349, 378–379 [75 Cal.Rptr.2d 716, 956 P.2d 1169] (*Kipp*).) However, the failure to give such an instruction is not prejudicial. During deliberations in *People v. Harris, supra*, 43 Cal.4th 1269, the jury sent the court a note asking for a definition of life without possibility of parole. With the approval of counsel, the court told the jury the concept did not require further definition. We held that the defendant was not prejudiced by the procedure to which he agreed. The instructions the jury had been given were "plain and accurate," leaving "no room for doubt over defendant's eligibility for parole." (*Harris, supra*, 43 Cal.4th at pp. 1317–1318; accord, *People v. Samuels* (2005) 36 Cal.4th 96, 135–136 [30 Cal.Rptr.3d 105, 113 P.3d 1125].) The same pattern instructions, CALJIC Nos. 8.84 and 8.88, were given here.

### 6. *CALJIC Nos. 8.85 and 8.88*

Defendant challenges two pattern instructions explaining statutory factors the jury was to consider in making its penalty decision (CALJIC No. 8.85) and on the weighing of those factors (CALJIC No. 8.88).[20]

### a. *CALJIC No. 8.85*

As we have recently affirmed, "CALJIC No. 8.85 is both correct and adequate." (*People v. Valencia* (2008) 43 Cal.4th 268, 309 [74 Cal.Rptr.3d 605, 180 P.3d 351].) We have repeatedly upheld it against the particular attacks made by defendant.

The "circumstances of the crime" factor stated in section 190.3, factor (a) does not foster arbitrary and capricious penalty determinations. (E.g., *People v. Barnwell* (2007) 41 Cal.4th 1038, 1058 [63 Cal.Rptr.3d 82, 162 P.3d 596] (*Barnwell*).)

The trial court is not obligated to delete inapplicable factors from the factors that may be considered in mitigation or aggravation. (E.g., *Harris, supra*, 43 Cal.4th at pp. 1320–1321.)

---

[20] Defendant relies upon the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

The use of the phrase "whether or not" to preface certain factors does not improperly prompt the jury to consider the absence of such factors as aggravating circumstances.[21] (E.g., *Harris, supra*, 43 Cal.4th at p. 1321.)

The use in the sentencing factors of the phrases "*extreme* mental or emotional disturbance" (§ 190.3, factor (d), italics added) and "*extreme* duress or . . . *substantial* domination of another" (*id.*, factor (g), italics added) does not inhibit the consideration of mitigating evidence or make the factors impermissibly vague. (E.g., *People v. Lewis* (2008) 43 Cal.4th 415, 532 [75 Cal.Rptr.3d 588, 181 P.3d 947] (*Lewis*).)

Written findings are not required as to the aggravating factors. (E.g., *People v. Watson* (2008) 43 Cal.4th 652, 703 [76 Cal.Rptr.3d 208, 182 P.3d 543] (*Watson*).)

### b.   *CALJIC No. 8.88*

CALJIC No. 8.88 adequately advises jurors on the scope of their discretion to reject death and return a verdict of life without possibility of parole (LWOP). (E.g., *People v. Stitely, supra*, 35 Cal.4th at p. 574.) We have also repeatedly upheld this instruction against similar particular attacks.

The language in CALJIC No. 8.88 directing the jury to determine whether the aggravating circumstances are "so substantial" in comparison to the mitigating circumstances is not unconstitutionally vague. (E.g., *Watson, supra*, 43 Cal.4th at p. 702.)

The instruction is also not unconstitutional for failing to inform the jury that: (a) death must be the appropriate penalty, not just a warranted penalty (e.g., *People v. Moon* (2005) 37 Cal.4th 1, 43 [32 Cal.Rptr.3d 894, 117 P.3d 591]); (b) an LWOP sentence is required, if it finds that the mitigating circumstances outweigh those in aggravation (e.g., *Moon, supra*, 37 Cal.4th at p. 42) or that the aggravating circumstances do not outweigh those in mitigation (e.g., *Kipp, supra*, 18 Cal.4th 349, 381); (c) an LWOP sentence may be imposed even if the aggravating circumstances outweigh those in mitigation (*Kipp, supra*, 18 Cal.4th at p. 381); (d) neither party bears the burden of persuasion on the penalty determination (e.g., *Harris, supra*, 43 Cal.4th at p. 1322).

Finally, section 190.3 and the pattern instructions are not constitutionally defective for failing to assign the state the burden of proving beyond a

---

[21] For example, section 190.3, factor (e): "Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act."

reasonable doubt that an aggravating factor exists, that the aggravating factors outweigh the mitigating factors, and that death is the appropriate penalty. As defendant acknowledges, we have repeatedly rejected these arguments. (E.g., *Lewis, supra*, 43 Cal.4th at p. 533.) The recent decisions of the United States Supreme Court interpreting the Sixth Amendment's jury trial guarantee[22] do not compel a different result. (*Lewis*, at p. 534.)

### 7. *Intercase Proportionality*

Contrary to defendant's contention, intercase proportionality review for death penalty cases is not required by the Eighth and Fourteenth Amendments to the United States Constitution. (E.g., *People v. Lindberg* (2008) 45 Cal.4th 1, 54 [82 Cal.Rptr.3d 323, 190 P.3d 664].)

### 8. *International Law*

Contrary to defendant's contention, the death penalty as applied in this state is not rendered unconstitutional through operation of international law and treaties. (E.g., *Barnwell, supra*, 41 Cal.4th at p. 1059.)

### 9. *Asserted Cumulative Error*

Finally, there was no cumulative prejudice. We have found only one minor error: the admission of evidence of defendant's noncriminal conduct in bringing BB guns to school when he was 12 years old. (See *ante*, at p. 1239.) Again, in light of the evidence of defendant's violent crimes as an adult, including his eight armed robberies, there is no reasonable possibility that this evidence was prejudicial. (*Ibid.*)

## III. DISPOSITION

We affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**MORENO, J.,** Concurring.—I disagree with the majority regarding the trial court's commutation instruction to the jury in response to its inquiries. In my view, such an instruction in that context was error. Moreover, the instruction was erroneously incomplete. I am bound by our prior case law, however, to

---

[22] *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]; *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738]; *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]; *Apprendi, supra*, 530 U.S. 466.

conclude that the error was harmless beyond a reasonable doubt, and on that basis concur in the majority's result.

We held in *People v. Ramos* (1984) 37 Cal.3d 136, 159 [207 Cal.Rptr. 800, 689 P.2d 430] (*Ramos*), that an instruction during the penalty phase of a capital trial sua sponte informing jurors of the possibility that the Governor may commute a life imprisonment without possibility of parole sentence—the so-called Briggs instruction—violates the due process clause of the California Constitution. The court reasoned that such an instruction (1) invites groundless speculation, (2) undermines a juror's sense of personal responsibility, and (3) undermines the Governor's power of commutation by encouraging jurors to preempt that power. (37 Cal.3d at pp. 156–158.) Nonetheless, the court recognized that if the jury itself raises a commutation issue, it "cannot be avoided" and should be addressed briefly, by accurately explaining that the commutation power applies to both life imprisonment without possibility of parole and death sentences, and emphasizing that it would be a violation of a juror's duty to consider commutation. (*Id.* at p. 159, fn. 12.)

Since *Ramos*, we have extended that recognition to situations in which a jury "implicit[ly]" refers to the commutation power, such as a jury's question about whether " 'our penalty decision [can] be modified through any part of the appeal process.' " (*People v. Hines* (1997) 15 Cal.4th 997, 1073, 1071 [64 Cal.Rptr.2d 594, 938 P.2d 388], italics omitted.) The key in *Ramos* is whether the jury raises the commutation issue so that it "cannot be avoided." (*Ramos, supra*, 37 Cal.3d at p. 159, fn. 12.) Although some of our post-*Ramos* cases have been less than rigorous in their reasoning, it is possible to argue that when juries ask broad, open-ended questions about the possibility of parole or the appeals process, such as in the above quoted passage from *Hines*, jurors are thinking about commutation, and that a commutation instruction is therefore appropriate.

But extending that rationale to the present case is unwarranted. As the majority opinion recounts, the jury asked during deliberations: "Does a conviction and sentence of Life without possibility of parole mean there is no future possibility of parole regardless of future changes of Law or Legal precident [*sic*]?" After consulting with counsel, the court issued this instruction: "The governor of the State of California has the power to commute or modify a sentence. This power applies to both life without possibility of parole and the death sentence. It would be a violation of your duty as a juror to consider the possibilities of such commutation of an appropriate sentence." (Maj. opn., *ante*, at pp. 1245–1246.)

It is difficult to say from the above that the jury was thinking about commutation and that therefore the issue of commutation could not be

avoided. The jury's question focuses on the power of the Legislature, or of the courts, to make changes in the law that will affect a life without parole sentence. As such, it was not necessary to raise the Governor's commutation power under existing law in order to answer it.

Thus, for example, in *People v. Turner* (2004) 34 Cal.4th 406, 436–437 [20 Cal.Rptr.3d 182, 99 P.3d 505], the trial court received the following three inquiries from the jury during penalty phase deliberations: "(1) 'We understand the sentence of life in prison without the possibility of parole to mean exactly what it implies. Does it?'; (2) 'After being sentenced to LWOP, if the law changed, could a person so sentenced then be eligible for parole?'; and (3) 'How does LWOP . . . differ from a sentence of life imprisonment?' " After consulting with counsel, the trial court instructed the jury as follows: " 'For the purpose of your deliberations, you are to assume life without the possibility of parole means what it says.' In responding to the second and third questions, the court told the jury: 'As to those remaining questions, the court cannot instruct you further and you are not to speculate or consider such matters.' " (*Id.* at p. 437.)

Here, as in *Turner*, the jury wanted to know whether changes in the law would affect a life without parole sentence, and the trial court could have instructed the jury simply not to " 'speculate or consider such matters,' " instead of sua sponte instructing on gubernatorial commutation that the jury's questions did not seem to raise. It cannot be the case that any time penalty phase jurors inquire into the true nature of a life without parole sentence, it is appropriate to instruct on commutation, no matter what form that inquiry takes. Because this is not a case where a commutation instruction "could not be avoided" (*Ramos, supra*, 37 Cal.3d at p. 159, fn. 12), and indeed, the trial court's answer was not particularly responsive to the jury's questions, I would conclude the trial court erred in instructing about commutation.

Moreover, I find merit in defendant's argument that even if the instruction was appropriately given, in light of his three prior convictions, the commutation instruction was erroneous because it failed to inform the jury that commutation was possible for a twice-convicted felon only upon the recommendation of four justices of this court. (See Cal. Const., art. V, § 8, subd. (a).) In so arguing, defendant relies on Ninth Circuit precedent holding that such an omission may in some circumstances constitute prejudicial error. (*Coleman v. Calderon* (9th Cir. 2000) 210 F.3d 1047 (*Coleman II*).) The majority reject *Coleman II*'s approach, reiterating this court's position that "there is no reason to mention the restrictions on the Governor's power of commutation because they are irrelevant to the jury's determination, and there is good reason not to stress a defendant's record." (Maj. opn., *ante*, at p. 1247.)

I find the above unpersuasive in the present case. First, while it may be true that "restrictions on the Governor's power of commutation . . . are irrelevant to the jury's determination," it is also true that the Governor's power of commutation is itself irrelevant to the jury's determination. When as here the trial court instructs in response to a jury question ostensibly about commutation, it is difficult to see why it should not instruct the jury in a manner that accurately describes the legal impediments to obtaining commutation, if the defendant is not opposed. As for the second reason, it is unclear why the general dictum that there is "good reason not to stress the defendant's record" applies in the present case. As the majority recounts, defendant had an extensive criminal history and several prior convictions, mostly stemming from the crime spree he engaged in between the time he committed the murder and the time he was apprehended. Considerable evidence of this criminal history was introduced during the penalty phase. In his closing argument, the prosecutor discussed that criminal history at length. In light of this intensive focus on defendant's criminal history during the penalty phase, it is difficult to say that modifying the commutation instruction in a way that alluded to that history would have been detrimental to defendant.

It is also within the realm of possibility that the trial court's instructional error was prejudicial. First, the fact that the jury asked these questions during the course of their deliberations meant that there was some likelihood that the answers mattered to those deliberations, and that a wrong answer could have influenced the jury against defendant. Moreover, the court erred not only by erroneously giving the commutation instruction, but also by not responding to the jury's real question, and it is possible additional prejudice resulted from that omission. Also to be considered in the prejudice equation is the closeness of the case. The fact that the panel's deliberations continued for five days, while not conclusive, is one indication of closeness. Furthermore, although it was a brutal murder, as most all death-eligible murders are, it was more impulsive than deliberate, and there is some truth to trial counsel's statement during closing argument that it was not "the worst of the worst" murders. Also significant, as defense counsel stressed, defendant was 18 years one month old at the time he committed the murder and, under the death penalty statute (Pen. Code, § 190.5) a person under 18 would not have been subject to the death penalty, even before the Supreme Court put that rule on a constitutional footing in *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1, 125 S.Ct. 1183]. Indeed, the murder of which defendant was convicted bore the hallmarks of an " 'impetuous and ill-considered action[] and decision[]' " (*id.* at p. 569) that juvenile criminals are particularly prone to, which the United States Supreme Court recognized in concluding that such criminals should not be subject to the death penalty. On the other hand, defendant's extensive criminal history could be considered in aggravation.

Although the harmless error question would be close if I were writing on a clean slate, this court's precedent holds that giving an instruction to disregard commutation renders any commutation instruction harmless. (*People v. Coleman* (1988) 46 Cal.3d 749, 782 [251 Cal.Rptr. 83, 759 P.2d 1260].) Bound by that precedent, I concur that giving the instruction in this case was not prejudicial error.[1]

Appellant's petition for a rehearing was denied September 23, 2009. Werdegar, J., did not participate therein.

---

[1] Because the error was harmless under this court's precedent, I do not reach the question whether the Attorney General is correct that any error was invited. I note that, generally speaking, the doctrine of invited error applies only in situations in which defense counsel has requested an instruction based on a "conscious and deliberate tactical choice." (*People v. Lucero* (2000) 23 Cal.4th 692, 724 [97 Cal.Rptr.2d 871, 3 P.3d 248].) It is unclear the extent to which that doctrine extends to instructions that have been consented to rather than requested (*ibid.*), nor is it clear whether trial counsel's decision in the present case to go along with an instruction that raised the possibility of gubernatorial commutation, somewhat incompletely, rather than responding to the juror question narrowly on its own terms, was the result of a tactical choice or mere inadvertence.